SCARIA and wife, Appellants, v. ST. PAUL FIRE & MARINE
INSURANCE COMPANY, and others, Respondents.*

*No. 311.   Argued February 3, 1975.—Decided April 10, 1975.*
(Also reported in 227 N. W. 2d 647.)

* Motion for rehearing denied, without costs, on June 30, 1975.

1

4

For the appellants there were briefs by *Gaines & Saicheck, S. C.,* attorneys, and *Irving D. Gaines, David A. Saicheck* and *Theodore B. Hertel, Jr.* of counsel, all of Milwaukee, and oral argument by *Irving D. Gaines.*

For the respondents Columbia Hospital and St. Paul Fire & Marine Insurance Company there was a brief by *Law Offices Richard J. Palmersheim* of Milwaukee, attorneys, and *Richard J. Palmersheim* of counsel, and oral argument by *Mr. Palmersheim.*

For the respondent David G. Kamper, M.D., there was a brief by *Arnold, Murray & O'Neill,* attorneys, and *Robert C. Watson* of counsel, all of Milwaukee, and oral argument by *Mr. Watson.*

BEILFUSS, J. The issues raised by the plaintiffs upon appeal are the following:

1. Did the trial court properly instruct the jury as to informed consent?

2. Did the trial court err in applying the locality rule?

3. Did the jury return a valid five-sixths verdict?

4. Did the trial court err in refusing to change the jury answers on causation from "No" to "Yes?"

5. Should a new trial be granted in the interest of justice?

The trial court instructed the jury with respect to the issue of informed consent as follows:

"With respect to your answer to the question inquiring as to the negligence of Dr. Kamper, Question No. 1, you are instructed that a physician and surgeon has a duty to make reasonable disclosure to his patient of all significant facts under the circumstances of the situation which are necessary to form the basis of an intelligent and informed consent by the patient to the proposed treatment or operation and the patient must have given such consent to the treatment or operation. This duty, however, is limited to those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition.

"Now, with respect to your answer to Question No. 2, inquiring as to the causal negligence of Dr. Kamper, you are instructed that if you find that the defendant Dr. Kamper did not reasonably disclose to the plaintiff K. S. Scaria all of the significant facts, then you are instructed that there must be a causal relationship between the physician's failure to adequately divulge and damage to the plaintiff. A causal relationship exists only when disclosure of significant risks incidental to treatment would have resulted in a decision against it. There is a causal connection only if it has been established that had the plaintiff been so informed, that then he would have declined the treatment as proposed."

We will first consider the doctor's duty to disclose and the patient's right to be informed of the risks of the proposed treatment or surgery.

The plaintiffs' principal objection to the instruction as given is the limitation of duty on the part of a physician or surgeon to inform the patient as to "those disclosures which physicians and surgeons of good standing

would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition."

This court in *Trogun v. Fruchtman* (1973), 58 Wis. 2d 569, 207 N. W. 2d 297, recognized that a patient had a right to know of significant potential risks involved in proposed treatment or surgery so that he could make a rational and informed decision of whether he would undergo the proposed procedures. In order for a patient to be able to give an informed consent, the physician or surgeon is under the duty to provide the patient with such information as may be necessary under the circumstances then existing.

The physician or surgeon, through education, training and experience, knows or should know the inherent risks of the proposed procedures and the probability of a successful result. He also appreciates the potential risks generally known by doctors in good standing. A physician or surgeon is not required to know every potential risk but only those known to a reasonably well-qualified practitioner or specialist commensurate with his classification in the medical profession.

The duty of a physician or surgeon is to exercise ordinary care. The first sentence of the challenged instruction is, in our opinion, an adequate general statement of that standard. Slightly paraphrased, it provides that a physician has a duty to make a reasonable disclosure to his patient of the significant risks in view of the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures if such are reasonably appropriate so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure. The patient then has a right to give or withhold his consent to the proposed treatment or procedure.

The second sentence of the challenged instruction limits the doctor's disclosures to "those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition."

We believe this limitation is too broad in that it limits the duty to a standard adopted by the physicians and surgeons as a group. We are not dealing primarily with the professional competence nor the quality of the services rendered by a doctor in his diagnosis or treatment. The right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure. Because of the patient's lack of professional knowledge, he cannot make a rational reasonable judgment unless he has been reasonably informed by the doctor of the inherent and potential risks. The right of the patient and the duty of the doctor are standards recognized and circumscribed by the law and are not entirely dependent upon the customs of a profession. The need of a particular patient for competent expert information should not necessarily be limited to a self-created custom of the profession.[2] The disclosures which would be made by doctors of good standing, under the same or similar circumstances, are certainly relevant and material and we surmise would be adequate to fulfill the doctor's duty of disclosure in most instances. However, the duty to disclose or inform cannot be summarily limited to a professional standard that may be nonexistent or inadequate to meet the informational needs of a patient.

We do recognize there must be some limitation upon the doctor's duty to disclose risks involved. A doctor

[2] *See Canterbury v. Spence* (D. C. Cir. 1972), 464 Fed. 2d 772; *Cobbs v. Grant* (1972), 8 Cal. 3d 229, 104 Cal. Rptr. 505, 502 Pac. 2d 1; and *Marsh Wood Products Co. v. Babcock & Wilcox Co.* (1932), 207 Wis. 209, 219, 240 N. W. 392.

should not be required to give a detailed technical medical explanation that in all probability the patient would not understand. He should not be required to discuss risks that are apparent or known to the patient. Nor should he be required to disclose extremely remote possibilities that at least in some instances might only serve to falsely or detrimentally alarm the particular patient. Likewise, a doctor's duty to inform is further limited in cases of emergency or where the patient is a child,[3] mentally incompetent or a person is emotionally distraught or susceptible to unreasonable fears.

In short, the duty of the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed.

We therefore conclude the instruction on informed consent as given was inadequate.

The plaintiffs also contend the instruction given to the jury on causation was erroneous in that it required the jury to apply an objective standard rather than a subjective one. They argue that *Trogun v. Fruchtman, supra,* failed to specify which standard should be used.

In deciding *Trogun,* this court relied, to a substantial degree, on three cases from other jurisdictions: *Canterbury v. Spence, supra; Cobbs v. Grant, supra;* and *Wilkinson v. Vesey* (R. I. 1972), 295 Atl. 2d 676. In *Canterbury,* at pages 790, 791, the court stated:

". . . as in malpractice actions generally, there must be a causal relationship between the physician's failure to adequately divulge and damage to the patient.

"A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would

---

[3] Consent in case the patient is a child is probably the obligation of the parent or guardian.

have resulted in a decision against it. . . The more difficult question is whether the factual issue on causality calls for an objective or a subjective determination.

"It has been assumed that the issue is to be resolved according to whether the factfinder believes the patient's testimony that he would not have agreed to the treatment if he had known of the danger which later ripened into injury. We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. To be sure, the objective of risk-disclosure is preservation of the patient's interest in intelligent self-choice on proposed treatment, a matter the patient is free to decide for any reason that appeals to him. . . But when causality is explored at a postinjury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: 'Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?' And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.

"In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.

"Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on

causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product."

Both *Cobbs, supra,* page 11, and *Wilkinson, supra,* page 689, adopt the objective standard based on similar reasoning.

In *Trogun, supra,* pages 602, 603, this court made reference to the objective standard in *Cobbs.* At page 604 of the *Trogun* decision, this court held:

". . . Experts are unnecessary to establish the materiality of the risk to a patient's decision to undergo treatment or to the 'reasonably, expectable effect of risk disclosure on the decision.' [Citing *Canterbury, supra,* page 792]. . . ."

The plaintiffs argue that the objective standard is unfair in that it deprives the patient of the right to make his own decision for whatever reasons he alone may deem appropriate. It is conceivable that a jury could find that a reasonable man, when apprised of the risks involved, would have consented to a procedure when in fact the plaintiff, K. S. Scaria, would not have consented. Even the subjective test, however, is not without its margin for error. We conclude that the objective, reasonable man approach is more workable and more fair in that it allows the jury to consider the plaintiff's testimony as to how he would have responded without being forced to engage solely in a test of the credibility of the plaintiff's hindsight after an undesirable result.

In our opinion the trial court's instruction as to causation on the question of informed consent was not erroneous.

Prior to trial, upon notice to all parties, plaintiffs' counsel took videotape depositions of two medical experts, Dr. Thomas F. Meaney of Cleveland, Ohio, and Dr. Eric K. Lang of Shreveport, Louisiana. The trial court refused to admit into evidence the entire Lang

deposition on the grounds that such testimony was irrelevant in light of the locality rule, which prevailed at the time of the trial. On the same basis, the court also refused to admit portions of the Meaney deposition describing the results of a survey in a Cleveland hospital, testing patient reaction to various levels of risk disclosure as to medical procedures the patients were about to undergo.

The locality rule, as it existed at the time of trial, was embodied in the trial court's instruction to the jury:

"You are instructed that it was the duty of the defendants. . . in rendering medical services to the plaintiff in treatment of his injuries, to exercise that degree of care, skill, and judgment which is usually exercised by reputable physicians and surgeons of the same school of medicine in Milwaukee County or in the same, similar, or surrounding localities, under like or similar circumstances, having due regard for the advanced state of medical science at the time in question. . . ." *See Burnside v. Evangelical Deaconess Hospital* (1970), 46 Wis. 2d 519, 522, 175 N. W. 2d 230.

The plaintiffs raise several arguments regarding the trial court's implementation of this rule, both as a rule of law and as a rule of evidence.

The locality rule, as it affects the admissibility of evidence, bears essentially on the relevancy of the evidence. Since the pertinent standard of care is defined in terms of what is done in the same or similar communities, evidence of what is done in dissimilar communities is irrelevant.

With respect to the trial court's refusal of the Meaney deposition insofar as it related to the informed consent patient survey, such evidence was properly disallowed on the grounds of irrelevancy. The plaintiffs contend that such evidence was relevant to establish that "if patients are fully informed of all risks, some will proceed to reject the advice of their physician and not permit

the procedure to be performed." The issue, however, is not what other patients in other situations would or would not expect in terms of disclosure or do in the light of full disclosure. The issue is what would a reasonable patient in the plaintiff's position expect in terms of risk disclosure. Thus the response of other individuals is irrelevant and the trial court ruled properly with respect to the Meaney deposition.

The jury in the case at bar rendered its verdict on April 6, 1973. Two weeks later, on April 20th, this court announced its decision in *Shier v. Freedman* (1973), 58 Wis. 2d 269, 283, 284, 206 N. W. 2d 166, 208 N. W. 2d 328, which abolished the locality rule altogether and provided that:

". . . Henceforth, in instructing juries in medical malpractice cases, the jury should be told in substance that a qualified medical (or dental) practitioner, be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances. Geographical area and its attendant lack of facilities are circumstances that can be considered if appropriate."

The court, by footnote, however, specifically states, "This change is not retroactive and will affect only those cases tried after the date of this opinion." *Id.*, page 283, footnote 2.

The plaintiffs' contention with respect to the locality rule is that notwithstanding the court's "prospective only" caveat, *Shier* should be given retroactive effect to the case at bar. Primary support for this argument is derived from *Benzschawel v. Stoll* (1974), 64 Wis. 2d 211, 213, 218 N. W. 2d 748, a per curiam opinion, where the court considered applying *Shier* retroactively but declined to do so because the locality rule issue was not raised at the trial level. Significantly, however, the

court pointed out, "We would not be adverse to extending the benefit of the abrogration of the locality rule in the instant case if the question had been properly raised and preserved." That case is distinguishable from the one at bar, however, because it was on appeal when *Shier v. Freedman, supra,* was decided, and thus does not come within the boundaries of the prospectivity rule of *Shier,* which proscribed its application to cases "tried after the date of this opinion."

The plaintiffs also rely on *Olson v. Augsberger* (1962), 18 Wis. 2d 197, 118 N. W. 2d 194, where this court allowed retroactive application of the contribution rule of *Bielski v. Schulze* (1962), 16 Wis. 2d 1, 114 N. W. 2d 105. However, *Olson* is also distinguishable from the case at bar because the court there specifically found that the fact situation involved was not contemplated in the retroactivity exception. *Id.* page 201.

The trial court did not err in adhering to the locality rule both in its rulings on the evidence and instructing the jury, because that was the law at the time of the trial. However, because the record reveals the plaintiffs made every reasonable effort to object to the now-abandoned locality rule, we hold upon the new trial of this case that the plaintiffs should be given the benefit of the abrogation of the locality rule.

As stated above, a new trial of the issues is to be ordered primarily because of the inadequacy of the informed consent instruction.

The trial court did not instruct the jury as to a duty on the part of the hospital or its employees to inform Scaria of the risks involved in the proposed procedures, nor would any such instruction have been appropriate under the facts of this case. In this case the duty to inform the patient of risks was solely that of the doctor.

The trial court did properly instruct the jury as to the duty resting upon the hospital and its employees in caring for Scaria while he was in the hospital.

The only evidence as to want of adequate care on the part of the hospital was the failure of a nurse to take Scaria's pulse and blood pressure at all of the intervals as directed by Dr. Kamper. The jury found the hospital negligent in this respect. The jury further found the hospital's negligence was not a cause of the unfortunate disability suffered by Scaria. We believe from all of the evidence in the case that this was the only proper verdict the jury could return. All of the medical evidence bearing upon the question was to the effect that the failure to take the pulse and blood pressure of Scaria in no way contributed to the cause of Scaria's paralysis, nor would this failure in any way affect the course of the paralysis after its onset. We conclude there was no liability on the part of the hospital and would have so concluded had we been presented with the problem in the form of a motion for directed verdict. We hold, therefore, that the judgment insofar as it dismissed the plaintiffs' action against Columbia Hospital must be affirmed.

The plaintiffs forcefully argue the verdict returned by the jury was fatally defective because of the numerous jurors dissenting to one or more questions of the verdict in violation of the five-sixths rule. Because we order a new trial, the verdict under consideration will in no way affect the final outcome of the case. The issue is moot and we do not consider it.

We conclude there should be a new trial as to all issues as they appear between Scaria and Dr. Kamper for the reasons set forth above. The plaintiffs assert the new trial should be limited to the issues of liability. Although challenge to the damages as determined by the jury is meager, we believe the interest of justice[4] requires a new trial on all issues.

[4] *See:* Sec. 251.09, Stats.; *Seif v. Turowski* (1970), 49 Wis. 2d 15, rehearing per curiam, pages 25, 26, 181 N. W. 2d 388, 183 N. W. 2d 28.

In the verdict now under consideration the liability issue of Dr. Kamper was submitted in one question, which provided: "Was the defendant David G. Kamper negligent with respect to the care and treatment of the plaintiff K. S. Scaria?" The plaintiffs allege that Dr. Kamper was negligent in two respects. One, in the care and treatment given and, two, in failing to adequately inform Scaria of the risks involved in the procedure. The question as submitted is not erroneous, especially in view of the fact that the instructions treated the two duties separately. However, because the standards by which these duties must be measured are somewhat different, we are of the opinion that upon proper motion or request the questions should be stated separately.

*By the Court.*—Judgment affirmed insofar as it dismisses the complaint against Columbia Hospital. Judgment reversed insofar as it dismisses the complaint against David G. Kamper and his insurance carrier, and cause remanded for a new trial.

ROBERT W. HANSEN, J. *(dissenting)*. Very recently this court made clear that a physician or surgeon is ". . . not an insurer of the results of his diagnosis or procedures." [1] Even the very best of them, we then and there noted, ". . . can be wrong in diagnosis or procedure." [2] In a lawsuit claiming medical malpractice, the question is not whether a physician has made a mistake but, rather, ". . . the question is whether he was negligent." [3] For, ". . . [u]nless the untoward result was caused by the failure to conform to the accepted standard of care, he is not liable in negligence for damages." [4]

---

[1] *Francois v. Mokrohisky* (1975), 67 Wis. 2d 196, 201, 226 N. W. 2d 470.

[2] *Id.* at page 201.

[3] *Id.* at page 201.

[4] *Id.* at page 201.

As to the proper standard of care, for the breach of which a physician or surgeon is liable in negligence, this court at this term held the standard to be:

" '[A] qualified medical (or dental) practitioner, be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances.' " [5]

Of this standard of professional care or duty owed, this court at this term, in *Francois*, held that in a medical malpractice lawsuit:

" '[A] plaintiff must prove the defendant failed to give him, not the highest degree of care, but merely the reasonable care and skill usually possessed by physicians of the same school. . . .' " [6]

To make crystal clear that it is the standard of care of the class that is involved, the members of the medical profession, this court at this term added:

". . . The standard to which they [members of the medical profession] must conform, however, is determined by the practices of neither the very best nor the worst of the class. Like automobile drivers, engineers, common laborers, and lawyers, they are obliged to conform to reasonable care in the circumstances." [7]

In the *Francois Case*, a few weeks ago, this court applied this standard of care or duty owed by a physician or surgeon to (1) diagnosis, and (2) care and treatment. Directing that the complaint be dismissed, this court there found no evidence that would have permitted the

[5] *Id.* at page 200, quoting and following *Shier v. Freedman* (1973), 58 Wis. 2d 269, 283, 284, 206 N. W. 2d 166, 208 N. W. 2d 328.

[6] *Id.* at page 201, quoting and reaffirming *Trogun v. Fruchtman* (1973), 58 Wis. 2d 569, 584, 207 N. W. 2d 297.

[7] *Id.* at page 201.

case to go to the jury, since ". . . no physician testified that what was done did not comport with approved medical practice under the circumstances." [8] That clearly is the majority rule followed in most states.[9] As clearly it is the standard of care found applicable by the trial court in the case before us as to (1) diagnosis, and (2) care and treatment. He so instructed the jury,[10] and no issue is raised on this appeal as to the correctness of such application of the *Francois* standard as to care.

The trial court additionally instructed the jury as to the duty of a physician or surgeon to make reasonable disclosure to his patient of all significant facts under the circumstances.[11] The trial court correctly stated

[8] *Id.* at page 201.

[9] *See:* 61 Am. Jur. 2d, *Physicians, Surgeons, etc.,* p. 230, sec. 110, stating: "Medical malpractice is a particular form of negligence that consists of not applying to the exercise of the practice of medicine that degree of care and skill which is ordinarily employed by the profession generally, under similar conditions and in like surrounding circumstances. . . . [I]n short, a physician is bound to bestow such reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases. . . ."

[10] The trial court instructed the jury: "You are instructed that it was the duty of the defendants, Dr. Kamper and Dr. Hughes, in rendering medical services to the plaintiff in treatment of his injuries, to exercise that degree of care, skill, and judgment which is usually exercised by reputable physicians and surgeons of the same school of medicine in Milwaukee County or in the same, similar, or surrounding localities, under like or similar circumstances, having due regard for the advanced state of medical science at the time in question. Failure on the part of the defendant doctors to have exercised that degree of care, skill, and judgment in their treatment of plaintiff's injuries would constitute negligence."

[11] The trial court instructed the jury that: ". . . you are instructed that a physician and surgeon has a duty to make reasonable disclosure to his patient of all significant facts under the circumstances of the situation which are necessary to form the basis of an intelligent and informed consent by the patient to the proposed treatment or operation . . . ."

this in terms of a duty on the part of the doctor, not a right or expectation on the part of the patient. There was and is a theory of surgery as an intentional tort of battery, with the fact of informed consent the crucial issue. However, our court has found this approach inadequate in situations ". . . where the alleged misconduct on the part of the physician amounts to a failure to disclose the ramifications of a pending course of treatment, therapy, or surgery . . . ." [12] So, instead, our court has recognized ". . . a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged that the patient-plaintiff was not informed adequately of the ramifications of a course of treatment." [13] Thus, we accepted the " '. . . prevailing view . . . that the action, regardless of its form, is in reality one for negligence in failing to conform to the proper standard, to be determined on the basis of expert testimony as to what disclosure should be made.' " [14]

This standard of complying with medical standards in the profession under the circumstances was here followed by the trial court, as to duty to inform as well as to care and treatment. The trial judge instructed the jury that the duty to disclose was limited to ". . . those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition." The majority opinion finds this too limited, but does ". . . surmise [that such disclosures] would be adequate to fulfill the doctor's duty of disclosure in most instances." The writer would agree with the trial court that it is adequate in all instances. If the standards of the profession are adequate as to the duty of a brain surgeon in diagnosis, treatment and surgical

---

[12] *Trogun v. Fruchtman, supra,* footnote 6, at pages 598, 599.

[13] *Id.* at page 600.

[14] *Id.* at page 598, quoting Prosser, *Law of Torts* (4th ed. 1971), p. 165, sec. 32.

procedures, they ought be equally adequate as to what ought be disclosed as to nature of the surgery and collateral risks involved. The majority does limit any duty of the surgeon to disclose to exclude disclosures that might ". . . detrimentally alarm the particular patient," or ". . . where the patient is a child . . . or a person is emotionally distraught or susceptible to unreasonable fears." The writer has more confidence in the standards of the professional group involved than in court or jury deciding what disclosures need or ought be made to a patient facing the surgeon's scalpel. Children play at the game of being a doctor, but judges and juries ought not.

The majority opinion substitutes a standard requiring the doctor to make such disclosures ". . . as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of the disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." There are several things wrong with the more elusive standard thus substituted, not as to diagnosis or treatment, but as to the duty to inform only.

The majority cites *Trogun* but ignores its clear mandate that, once the plaintiff has established a prima facie showing of a failure of the physician to inform the patient, ". . . the physician *must come forward* with his explanation of the reasons for not so informing the patient, *including evidence that such advice was not customarily given.*" (Emphasis supplied.) [15] The *Trogun* decision further states: *"As to the scope of the physician's duty to disclose, see Shier v. Freedman, supra."* (Emphasis supplied.) [16] That decision, quoted above, clearly states that a physician or surgeon is to be subject to liability in an action for negligence only ". . . if he

[15] *Trogun v. Fruchtman, supra,* footnote 6, at page 604.
[16] *Id.* at page 604, footnote 59.

fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances. . . ." [17] The standard of care, reiterated by this court at this term in *Francois*, as to care and treatment, is the same standard of care that *Trogun* held applicable to the duty to inform.

The majority opinion states that the ". . . right of the patient and the duty of the doctor are standards . . . not entirely dependent upon the customs of a profession." This blurs, sub silentio, the *Trogun* substitution of a duty to inform for a requirement of consent to avoid a battery. It rejects, without saying so, the standard of care in *Shier* made applicable by *Trogun* as to the duty to disclose. More inexplicably, it abandons, without mention, the holding at this term, in *Francois*, that the duty of a doctor is based on ". . . approved medical practice under the circumstances." Reference in the majority opinion to "customs of *a* profession" is strange for the reason that the added hairshirt of the average man test, here placed on the backs of the medical profession, is placed, in malpractice lawsuits, on no other professional group. When a lawyer is sued for malpractice, the client-plaintiff must establish a failure to meet the standard of professional competence in the legal profession. The standards of the profession, not the expectations of the average client, set the duty owed. The claim of legal malpractice must rest upon a breach of a duty owed under the standard of professional competence of the legal profession. While the duties involved are different, the writer sees no reason why the standard of care devolving upon the doctor should be higher or different from that placed upon the lawyer next door. [18] The writer would affirm

[17] *Shier v. Freedman, supra*, footnote 5, at pages 283, 284.

[18] Prosser, *Law of Torts* (4th ed. 1971), pp. 161, 162, sec. 32, stating: ". . . Most of the decided cases have dealt with physicians and surgeons, but the same is undoubtedly true of dentists,

the judgment of the trial court which confirmed the jury verdict and dismissed the complaint of the plaintiff.

I am authorized to state that Mr. Justice LEO B. HANLEY joins in this dissent.

pharmacists, psychiatrists, attorneys, architects and engineers, accountants, abstracters of title, and many other professions . . . . [A]llowing for the inevitable differences in the work done, the principles applied to all of these appear to be quite identical . . . . The formula under which this usually is put to the jury is that he must have the skill and learning commonly possessed by members of the profession in good standing; and he will be liable if harm results because he does not have them. . . ."