Richard Bubb and Marjorie Bubb,
Plaintiffs-Appellants,†

v.

William Brusky, M.D., Saint Agnes Hospital,
Xian Feng Gu, M.D., Lakeside Neurocare Limited
and Medical Protective Company,
Defendants-Respondents,

West Bend Company, Subrogated Defendant.

Court of Appeals

*No. 2007AP619. Submitted on briefs February 14, 2008.*
*—Decided June 11, 2008.*

2008 WI App 104

(Also reported in 756 N.W.2d 584.)

† Petition to review granted 9/11/08, Ziegler, J., did not participate. Oral argument held March 5, 2009.

187

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *John L. Cates* and *Heath P. Straka* of *Gingras, Cates & Luebke, S.C.*, Madison.

On behalf of the defendants-respondents, Xian Feng Gu, M.D., Lakeside Neurocare Limited and the Medical Protective Company, the cause was submitted on the brief of *Peter J. Hickey* and *Ann C. Weiss* of *Everson, Whitney, Everson & Brehm, S.C.*, Green Bay.

On behalf of the defendants-respondents, William Brusky, M.D. and The Medical Protective Company, the cause was submitted on the brief of *Paul H. Grimstad* and *Jacqueline Lorenz Sehloff* of *Nash, Spindler, Grimstad & McCracken, LLP*, Manitowoc.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. SNYDER, J.   Richard and Marjorie Bubb initiated a medical malpractice action against Dr. William Brusky, Dr. Xian Feng Gu, St. Agnes Hospital, and their insurers. The Bubbs contend the circuit court erred when it refused to submit the question of informed consent to the jury, effectively dismissing that portion

of their claim and limiting the inquiry to whether Dr. Brusky and Dr. Gu were negligent in their care of Richard. The Bubbs submit that sufficient evidence supported their claim that the doctors failed to adequately inform Richard of alternate, viable treatment options and thereby prevented him from giving informed consent to be sent home from the emergency room of St. Agnes Hospital. We disagree and affirm the judgment.

## BACKGROUND

¶ 2.   On the evening of October 24, 2001, Richard was having dinner and Marjorie noticed that he was having some trouble eating his food. As she was trying to find out what was wrong, Richard fell out of his chair onto the floor. Marjorie called for help from a neighbor and then called for an ambulance. The ambulance took Richard to the emergency department at St. Agnes Hospital, and Marjorie arrived soon thereafter.

¶ 3.   Dr. Brusky was on duty in the emergency department that evening. He reviewed Richard's symptoms and ordered several tests, including a CT scan, an EKG, and a blood test. Richard's symptoms began to diminish while he was at the hospital. After the tests were done, Richard told Marjorie and Dr. Brusky that he was feeling better and wanted to go home. Based upon the tests performed and Richard's resolving symptoms, Dr. Brusky concluded that Richard had experienced a transient ischemic attack, or TIA.[1] The primary cause of a TIA is atherosclerotic disease, a build-up of

---

[1] A TIA is a short-term deprivation of oxygen to the brain that results in temporary, stroke-like symptoms.

191

cholesterol plaque, often called "hardening of the arteries," that can diminish the heart's capacity to provide blood to the brain.

¶ 4. Dr. Brusky then made a call to Dr. Gu, a neurologist, who could provide more specialized care for Richard. Dr. Brusky went over Richard's condition with Dr. Gu and Dr. Gu agreed to see Richard for follow up on the TIA. Dr. Brusky advised Richard to call Dr. Gu the next morning. Marjorie called and scheduled an appointment for Richard with Dr. Gu on November 5, 2001, which was the first available opening. However, on October 26, Richard was taken to the emergency room at St. Joseph's Hospital in West Bend because he had suffered a stroke. The doctors discovered that Richard's right carotid artery showed a ninety percent blockage.

¶ 5. The Bubbs initiated this lawsuit, claiming that the negligence of Drs. Brusky and Gu caused Richard serious and permanent injuries to his left arm, left leg, and the left side of his face. The complaint alleged that Dr. Brusky was negligent as to the standard of care provided to Richard and that he was further negligent when he failed to inform Richard of "additional diagnostic tests or alternate treatment plans." The complaint alleged that Dr. Gu was negligent in the standard of care he provided, specifically for failing "to instruct his office staff that . . . Richard Bubb's appointment with him should be prioritized," and thereby depriving Richard of timely treatment.

¶ 6. During the jury trial, several experts testified about the treatment provided to Richard, the alternatives available at the time Richard was at St. Agnes Hospital, the role of an emergency department physician, and a physician's possible courses of action when presented with a TIA. Dr. Robert Powers testified that

192

an emergency department physician must make a general assessment and stabilize the patient, create a differential diagnosis and make an appropriate disposition or referral for additional care. Dr. Powers also explained that there is a debate in the medical community about how to address suspected TIA episodes after the initial evaluation. Dr. Robert Stuart testified that some medical institutions admit all TIA patients while others discharge them with a referral to a neurologist.

¶ 7.  At the close of evidence, the Bubbs argued that the circuit court should instruct the jury on informed consent and should submit a special verdict question allowing the jury to determine whether Richard should have been advised of the alternative treatment option of admission to the hospital for a carotid Doppler ultrasound test. They asserted that WIS. STAT. § 448.30 (2005–06),[2] the informed consent statute, created this cause of action and that the jury should be provided with WIS JI—CIVIL 1023.2, which instructs in relevant part:

> A doctor has the duty to provide [his or her] patient with information necessary to enable the patient to make an informed decision about a [diagnostic procedure] and alternative choices of [diagnostic procedures]. If the doctor fails to perform this duty, [he or she] is negligent.
>
> To meet this duty . . . the doctor must provide [the] patient with the information a reasonable person in the patient's position would regard as significant when deciding to accept or reject [the diagnostic procedure] . . . . [Y]ou should determine what a reasonable

[2] All references to the Wisconsin Statutes are to the 2005–06 version.

person in the patient's position would want to know in consenting to or rejecting a medical [diagnostic procedure].

The doctor must inform the patient whether [the diagnostic procedure] is ordinarily performed in the circumstances confronting the patient, whether alternate [procedures] approved by the medical profession are available, what the outlook is for success or failure of each alternate [procedure], and the benefits and risks inherent in each alternate [procedure].

¶ 8. The court discussed jury instructions and the form of the special verdict off the record with the parties. Back on the record, the court noted that there had been "a rather lengthy discussion" about whether to include WIS JI—CIVIL 1023.2. Appellate review is better served by following the WIS. STAT. § 901.03(1)(a) procedure of stating objections and the grounds for the objection on the record. *State v. Munoz*, 200 Wis. 2d 391, 402, 546 N.W.2d 570 (Ct. App. 1996). If a matter is significant enough to invite appellate review, it is too important to subject to a remote, unrecorded summation process. *See id.* When a jury instruction and special verdict conference is not on the record, it is essential that the subsequent on-the-record comments repeat or summarize the arguments and confirm exactly what was presented to the circuit court at the time of its ruling. *See id.* at 403. Here, the Bubbs' attorney took the opportunity to summarize his argument for the record. However, when Dr. Brusky's attorney was given the opportunity to make a record, he referred the circuit court back to arguments he had made off the record and stated, "I could go through the whole litany, if you want me to, of why, as far as Dr. Brusky is concerned, this is not an informed consent case, but the

Court's heard it [off the record] and the Court's ruled." Dr. Gu's attorney provided little else, stating, "I stand on the same thing," and adding that Dr. Gu never treated Richard and therefore a duty to inform never arose. Counsels' failure to make a complete record of their arguments borders on waiver. We are left to infer the substance of the arguments from the court's decision.

¶ 9. The Bubbs put their position on the record, emphasizing that WIS. STAT. § 448.30 created a standard of care related to the duty to inform. They further relied on *Martin v. Richards*, 192 Wis. 2d 156, 181, 531 N.W.2d 70 (1995), where the supreme court explained:

> It may well be a "medical decision" under these circumstances to decide not to do a CT scan, or to decide not to hospitalize the patient in a hospital that can treat an intracranial bleed if it should occur. The statute on its face says, however, that the patient has the right to know . . . that there are alternatives available.

¶ 10. The Bubbs pointed to the evidence their experts had presented, specifically regarding the "well-recognized" use of the carotid Doppler ultrasound when presented with a TIA patient and that patient's increased risk of a stroke within forty-eight hours of leaving the hospital. Dr. Brusky, they argued, failed to inform Richard about the Doppler ultrasound test and instead presented discharge from St. Agnes and prompt follow up with Dr. Gu as the only course of action. The Bubbs asserted that the choice of whether to seek immediate admission to St. Agnes and to undergo the carotid Doppler ultrasound should have been Richard's.

¶ 11. Dr. Brusky and Dr. Gu countered that the Bubbs had not presented evidence to support an in-

formed consent claim. They argued that Richard's case was about the speed with which things should have been done, not whether Richard was properly informed. The doctors contested any suggestion that things would have turned out differently had Richard been told of a test for diagnosing a blocked artery. They characterized the Bubbs' position as follows:  Richard should have been admitted to St. Agnes immediately, a Doppler ultrasound should have been performed, a specialist should have been called in for a consultation, and an emergency endarterectomy performed. They emphasized that Richard's stroke occurred less than forty-eight hours after his TIA, a shorter timeline than all of these actions could have been performed.

¶ 12.  The circuit court determined that the informed consent instruction was not applicable. It turned to *Martin* for guidance. The court distinguished the *Martin* case, stating that the doctor in *Martin* "had no diagnosis and had a test that he could run in order to specifically rule out . . . what he was wondering about." In contrast, the court noted, Dr. Brusky did have a definitive diagnosis that every expert witness agreed with:  TIA. Further, the court observed that Richard was sent home with an information sheet that advised him he was at risk of a stroke and to seek follow-up care. The court also recalled evidence that the carotid Doppler ultrasound "in all likelihood . . . would not" have been done until the next day, which raised causation problems for the informed consent claim. Finally, the circuit court distinguished the informed consent duty of Dr. Brusky from that of Dr. Gu. The court noted that Dr. Gu's duty to inform Richard of alternatives did not exist because he was merely the "consulting doctor."[3]

---

[3] In so holding, the circuit court cited *Martin v. Richards*, 192 Wis. 2d 156, 531 N.W.2d 70 (1995), for the proposition that

¶ 13. The jury returned a verdict in favor of Dr. Brusky and Dr. Gu, determining that neither doctor was negligent in his care and treatment of Richard. The circuit court entered judgment dismissing the Bubbs' claims and awarding costs to the defendants. The Bubbs moved for a new trial pursuant to WIS. STAT. § 805.15, arguing, among other things, that the circuit court had improperly dismissed the informed consent claim and specifically challenging the decision to omit the informed consent jury instruction and special verdict question. The court denied the Bubbs' motion and they now appeal.

## DISCUSSION

¶ 14. The Bubbs ask us to resolve whether the verdict was fatally flawed because it did not require the jury to determine whether Dr. Brusky and Dr. Gu were negligent in failing to inform Richard of an alternative diagnostic treatment and whether that failure was a cause of Richard's injuries. The Bubbs argue that the jury should have been properly instructed on an informed consent question and given the opportunity to resolve it.

*Standard of Review*

¶ 15. The Bubbs argue that the circuit court's refusal to instruct the jury and submit a special verdict

a consulting doctor is not subject to informed consent. That proposition is broader than *Martin* provides. In *Martin*, the supreme court held that the informed consent statute did not apply to that particular consulting physician because he was given incomplete information about the patient and could therefore not be expected to offer treatment alternatives. *Id.* at 195. In contrast, Dr. Brusky informed Dr. Gu of all relevant information, including a correct diagnosis of the TIA.

question on the issue of informed consent was tantamount to a directed verdict or dismissal based on insufficiency of the evidence. Thus, they assert that our standard of review is de novo. A directed verdict requires the court to resolve a claim as a matter of law. *See* Wis. Stat. § 805.14(4). A dismissal on grounds of insufficiency of the evidence is appropriate where there is no credible evidence to support a finding in favor of the claim. *See Martin*, 192 Wis. 2d at 167.

¶ 16.   Dr. Busky and Dr. Gu assert that our review must be more deferential. It is well established that a circuit court has broad discretion in choosing how to instruct the jury. *State v. Lenarchick*, 74 Wis. 2d 425, 455, 247 N.W.2d 80 (1976) (if the instructions adequately cover the applicable law, we will not reverse even when refused instructions were not erroneous). The circuit court has significant discretion in crafting the special verdict. *See Rungo v. St. Paul Fire and Marine Ins. Co.*, 197 Wis. 2d 594, 602, 541 N.W.2d 173 (Ct. App. 1995). Therefore, the form of the special verdict is discretionary and we will not interfere with the court's exercise of that discretion so long as all issues of ultimate fact are covered by appropriate questions. *Fischer v. Wisconsin Patients Comp. Fund*, 2002 WI App 192, ¶ 7, 256 Wis. 2d 848, 650 N.W.2d 75.

¶ 17.   We agree with the Bubbs that when the court refused to instruct the jury on informed consent and refused to include an informed consent question on the special verdict, it effectively directed a verdict on the claim. This is not a situation where the court rejected certain wording or companion instructions relevant to a particular claim; rather, the court rejected a distinct cause of action. Furthermore, the court's

reasoning measured the sufficiency of the evidence for the asserted claim, an inquiry the court must undertake when a directed verdict is considered. *See* WIS. STAT. § 805.14(4). Thus, we review the court's decision de novo.

*Failure to Obtain Informed Consent*

¶ 18.   "A failure to diagnose is one form of malpractice. A failure to obtain informed consent is another discrete form of malpractice, requiring a consideration of additional and different factors." *Hannemann v. Boyson*, 2005 WI 94, ¶ 40, 282 Wis. 2d 664, 698 N.W.2d 714 (citations omitted). The obligation to secure informed consent before performing a non-emergency procedure is premised on the notion that "a person of sound mind has a right to determine, even as against his [or her] physician, what is to be done to his [or her] body." *Id.*, ¶ 34 (citation omitted). In an informed consent claim, we consider what a reasonable patient would want to know when making a medical decision. *Id.*, ¶ 35.

¶ 19.   The informed consent statute provides in part, that "[a]ny physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments." WIS. STAT. § 448.30. The Bubbs assert that the evidence demonstrated a violation of this statute by both Dr. Brusky and Dr. Gu. Because each doctor played a different role on the night of October 24, 2001, we must assess the claim as it pertains to each doctor individually.

¶ 20.   We begin with Dr. Gu. As stated earlier, Dr. Brusky called Dr. Gu and advised him of Richard's history, his symptoms, his current condition and the

test results. Dr. Brusky shared his opinion that Richard had experienced a TIA. He went through the aftercare instructions with Dr. Gu to be sure it was what Dr. Gu wanted to do, reasoning that Dr. Gu would be "the one [who was] going to be taking care of [Richard]." Dr. Brusky and Dr. Gu then agreed that Richard should call Dr. Gu's office the next morning to schedule an appointment.

¶ 21. The Bubbs argue that Dr. Gu, through his agent Dr. Brusky, had the duty to inform Richard of the carotid Doppler ultrasound test and any risks of forgoing the test. We disagree. Whether a suit for malpractice will lie against a particular physician depends upon whether there is a physician-patient relationship between that physician and the plaintiff. WISCONSIN STAT. § 448.30 provides that only the *treating* physician owes the responsibility of informed consent to the patient. A physician-patient relationship is a trust relationship. *See Brown v. Dibbell*, 227 Wis. 2d 28, 46–47, 595 N.W.2d 358 (1999). Dr. Gu, who confirmed Dr. Brusky's diagnosis and agreed to see Richard for follow-up care, had no statutory duty to inform until he treated Richard. Accordingly, the circuit court properly withheld any informed consent claim against Dr. Gu from the jury.

¶ 22. We turn next to the claim against Dr. Brusky. The informed consent statute requires that the patient be informed of alternatives that are available and viable. *See* WIS. STAT. § 448.30. An expert witness provided credible evidence that there is a controversy in the larger medical community about whether a patient who presents at an emergency room with a TIA should be discharged with instructions or admitted for further testing. The expert testified that there is no "universal

agreement" in the medical community regarding how a patient with a TIA should be treated when they present at an emergency department. The witness characterized the controversy as "whether the patients should be admitted for care or whether it's safe for them to be discharged." The witness agreed that management of patients with a TIA "varies widely, with some institutions admitting all patients and others proceeding with outpatient evaluation."

¶ 23.  The Bubbs argue that Dr. Brusky should have told them about the inpatient option and they direct us to *Martin* for support. In *Martin*, a fourteen-year-old girl was injured while riding her bicycle. *Martin*, 192 Wis. 2d at 163. She arrived at the Fort Atkinson Memorial Hospital emergency room with her father. *Id.* at 162–64. Martin had been unconscious at the scene of the accident, she had vomited several times, she showed signs of amnesia, and she had visible swelling and bruising in "an area of the middle mingeal artery, one of the arteries commonly torn in instances of intracranial bleeding." *Id.* at 164. Dr. Richards, who was staffing the emergency room at the time, diagnosed a concussion and expressed a concern about "the possibility of neurological complications," specifically intracranial bleeding. *Id.* at 178. Dr. Richards admitted Martin to the hospital for "careful neurological followup." *Id.* Expert testimony established that if intracranial bleeding did occur, immediate action was required. *Id.* at 179.

¶ 24.  Dr. Richards did not inform Martin's father of two things. First, Dr. Richards did not explain that if an intracranial bleed did occur, the hospital was not equipped to treat it and Martin would have to be transferred to a different hospital. *Id.* Dr. Richards also did not explain that a CT scan was available and would detect intracranial bleeding. *Id.* At trial, Dr. Richards

argued that he should not have a duty to inform a patient of alternate treatments for a condition not diagnosed or not being treated. *Id.* at 180.

¶ 25.  The court disagreed with Dr. Richards, stating that Dr. Richards knew Martin's condition was more serious than a simple concussion. *Id.* Under these circumstances, the court held, he had a duty to inform Martin's father about the CT scan and the lack of a neurosurgeon at that hospital because a reasonable person in that situation would have wanted to know before choosing a course of treatment. *Id.* at 181. The jury found that Martin's father would have chosen to have the CT scan done and to transfer to a hospital with a neurosurgeon had those alternatives been disclosed. *Id.*

¶ 26.  However, the *Martin* decision does not provide the support that the Bubbs seek. We emphasize that *Martin*, by its own terms, requires a fact-specific inquiry. *Id.* at 175 ("The information that is reasonably necessary for a patient to make an informed decision regarding treatment will vary from case to case."). Here, the Bubbs were able to establish that there is a controversy in the larger medical community about whether a patient who presents at an emergency room with a TIA should be discharged with instructions or admitted for further testing. However the Bubbs' *Martin* analogy fails when we look closely at the availability and viability of the inpatient ultrasound test under the facts of this case. It is undisputed that Dr. Brusky's diagnosis of a TIA was correct and it was complete. A TIA normally resolves within twenty-four hours, which is one of the features that distinguishes it from a stroke. Unlike the patient in *Martin*, Richard was never admitted to the hospital. We note that Dr. Brusky did not have admitting privileges at St. Agnes hospital and, therefore,

hospitalizing Richard was not a viable option. As Dr. Brusky testified, Richard was treated "on an emergency basis only." He explained that an emergency physician "makes the diagnosis that it's a neurologic problem," and the "details of what's going on with this individual" are taken up by the specialist.

¶ 27. The evidence also shows that a neurologist may choose to examine the carotid artery by ultra-sound, magnetic resonance angiography, routine an-giography, or by another method. Dr. Brusky could not predict what tests Dr. Gu might want performed for follow-up care.[4] Dr. Brusky testified that he would not presume to know which test the specialist would prefer and, further, that he did not know of any ultrasound technician on call for the emergency department that night. Having considered the record facts, we conclude that the Bubbs' evidence did not establish that a carotid Doppler ultrasound was a viable alternative treatment for Richard's properly diagnosed TIA.

¶ 28. We also observe that the Bubbs would have to show that Richard would have chosen the inpatient ultrasound test had it been presented as an option and that failure to inform him of that alternative caused his injury. *See Fischer*, 256 Wis. 2d 848, ¶ 8. Richard was told that because of the TIA, he was at risk for a stroke and that he needed follow-up care. Unlike the patient in *Martin*, Richard left the hospital knowing that his

---

[4] Dr. Brusky did have the authority to order certain tests from the emergency department. He did a CT scan to look for bleeding in the brain, he ordered an EKG to look for an arrhythmia, and he ran blood and urine tests to look for abnormalities in the body's chemistry. Aside from the blood alcohol test, which indicated that Richard had a blood alcohol concentration of .08 percent, none of the tests showed anything unusual.

condition required further tests and treatment with a specialist. Dr. Brusky did not decide to forgo diagnostic treatment, he understood that it would be done by a specialist within the next week.[5] We also note that Richard's symptoms had resolved while he was in the emergency department and he told Dr. Brusky that he wanted to go home. Dr. Brusky noted that Richard's symptoms had "basically resolved," and Richard stated he felt "basically back to normal."

¶ 29. Ultimately, the Bubbs are arguing that Richard's follow-up care was not done quickly enough. Their complaint is about a lack of urgency rather than a lack of information. Accordingly, we agree with the trial court's decision to instruct the jury on the standard of care, but withhold the issue of informed consent.

## CONCLUSION

¶ 30. The circuit court determined that the evidence did not support a malpractice claim based on informed consent against Dr. Brusky or Dr. Gu. Our review of the record facts and the applicable legal standards confirms that the court's decision was correct. We affirm the judgment.

*By the Court.*—Judgment affirmed.

¶ 31. BROWN, C.J. (*dissenting*). For me the question in this case is simply this: When there is widespread debate in the medical community about two distinct protocols for addressing a medical condition, must the treating physician inform the patient of the

---

[5] The aftercare sheet given to Richard instructs him to call Dr. Gu "as soon as possible" to make an appointment "this week."

alternatives? In my view, that question is answered "yes" by WIS. STAT. § 448.30, which states that "[a]ny physician who treats a patient *shall inform the patient* about the availability of *all alternate, viable medical modes of treatment* and about the benefits and risks of these treatments." (emphasis added.)

¶ 32. But you do not have to take my word on the meaning of this statutory language: you can read, in *Martin v. Richards*, our supreme court's exegesis and application. In that case, the court restated the statute's standard as "what would a reasonable person in the patient's position want to know in order to make an intelligent decision with respect to the choices of treatment or diagnosis?" *Martin v. Richards*, 192 Wis. 2d 156, 176, 531 N.W.2d 70 (1995). The court also made clear that the statute is *not* about whether the doctor makes the right medical decision, but rather about whether the doctor provides the patient with the information that the patient needs to make a decision of his or her own:

> It may well be a "medical decision" under these circumstances to decide not to do a CT scan, or to decide not to hospitalize the patient in a hospital that can treat an intracranial bleed if it should occur. The statute on its face says, however, that the patient has the right to know, with some exceptions, that there are alternatives available. The doctor might decide against the alternate treatments or care, he [or she] might try to persuade the patient against utilizing them, but he [or she] must inform them when a reasonable person would want to know. Here, Mr. Martin could have decided to have a CT scan done or could have decided to take Ms. Martin to another hospital with a neurosurgeon.

*Martin*, 192 Wis. 2d at 181.

205

¶ 33.   In this case, Dr. Brusky confronted a TIA and chose one course of action:    sending Richard Bubb home with instructions for follow-up care. However, as Dr. Brusky's own expert testified, there was another, distinct course of action that is widely used in TIA cases— admission and immediate further testing for the potentially dangerous underlying causes. Dr. Brusky[1] did not inform Richard of this course of action, as the statute requires. These facts, along with causation, make out an informed consent claim that should have gone to the jury, as *Martin* makes clear. The majority attempts to avoid *Martin* by drawing (in my view irrelevant) factual distinctions, and it focuses on the details of that case at the expense of ignoring both the language of the statute and *Martin*'s central point:    that the legislature, by the informed consent statute, has acted to protect the patient's right to know his or her options. *See id.* at 175. The majority would deprive the Bubbs of that right, apparently because it believes that Dr. Brusky's "medical decision" was the correct one, or at least reasonable under the circumstances. This is not the law. I dissent.

¶ 34.   I will begin with the points on which the majority and I agree. The circuit court was required to submit the informed consent claim to the jury unless there was "no credible evidence" to sustain a verdict for the Bubbs. Majority, ¶¶ 15, 17. There was expert testimony (by Dr. Brusky's expert) that there are two established options for treating TIA patients:    admit them immediately, or send them home and do further testing in the future. The expert further testified that treatment of TIA patients "varies widely, with some

---

[1] I agree with the majority's conclusion with respect to Dr. Gu.

institutions admitting all patients and others proceeding with outpatient evaluation." Majority, ¶ 22. The majority brings this testimony up but does not comment on it; I assume, however, that the majority would concede that it constitutes credible evidence.

¶ 35. The next question is, evidence of what? I find unavoidable the conclusion that what the expert was describing was an "alternate, viable mode of treatment." The majority, however, does manage to avoid this conclusion, by drawing a series of distinctions from *Martin*. The majority first states that the diagnosis in this case was "correct and it was complete." Majority, ¶ 26. It is true that in *Martin*, the supreme court talked about diagnoses: it rejected a doctor's argument that only "affirmative, invasive treatments" could be considered alternate, viable modes of treatment under the statute. *Martin*, 192 Wis. 2d at 169, 176. It also rejected the doctor's factual claim that he had not diagnosed intracranial bleeding and therefore could not be required to give information about treatments or tests for it. *Id.* at 180–81. It did *not* say that misdiagnosis, or lack of a diagnosis, was a *requirement* for an informed consent case. Again, the issue in an informed consent case is not whether the doctor made a "correct" decision, but whether the doctor failed to tell the patient what a reasonable person would want to know in order to make his or her *own* decision. *Id.* at 181. The majority's latching on to the "correct," "complete" diagnosis here betrays its misdirected focus: it is treating this claim like an ordinary malpractice claim and evaluating Dr. Brusky's treatment, rather than applying the informed consent statute and addressing whether he properly informed Richard of his options.

¶ 36. The majority also appears to conclude that there was not really a choice between "alternate" modes

of treatment here, stating that the "Bubbs' complaint is about a lack of urgency rather than a lack of information" and that "[u]nlike the patient in *Martin*, Richard left the hospital knowing that his condition required further tests and treatment with a specialist." Majority, ¶¶ 28–29. Apparently the majority believes that being sent home and told to schedule an appointment with a specialist is the same thing as being admitted and given an ultrasound examination as soon as possible. As a matter of logic, this strikes me as highly suspect: obviously the two courses of action differ significantly, as the outcome in this case suggests. But again, you do not have to take my word for it: you could ask Dr. Brusky's own expert, who testified to the debate within the medical community over the two alternate treatment protocols. And, of course, because of this testimony, the trial court should have asked the jury, who are the proper finders of such facts.

¶ 37. If there was credible evidence, as I believe there was, that an "alternate" mode of treatment existed, the next question is whether this "alternate" course of action was "viable." The supreme court in *Martin* defined "viable" in this statutory context: "Presumably the use of the word 'viable' in the statute was intended to require disclosure to the extent mandated in *Scari a* [*v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975)]: disclosure only of information reasonably necessary for a patient to intelligently exercise his or her choice regarding medical treatment." *Martin*, 192 Wis. 2d at 174–75. It follows that a doctor need not give information about a treatment that is of negligible potential worth or is for some reason not available to the patient.

¶ 38. The majority concludes that admission and further diagnostic testing was not a "viable" course of

treatment because Dr. Brusky was an ER physician treating Richard on an emergency basis and did not have admitting privileges at St. Agnes, and also because no technician was on call for the emergency department that evening. Majority, ¶¶ 26–27. But the informed consent law does not require a physician only to inform a patient about procedures that that particular physician can perform at that very moment. Rather, the law requires a doctor to inform a patient of "all alternate, viable medical modes of treatment." The fact that another physician would perform the test does not mean that the test is not viable.

¶ 39. And once again, I am not speaking on my own authority here, but simply reading *Martin*. In that case, the defendant doctor was *also* an ER physician, *also* treating the patient on an emergency basis, and *also* did not have admitting privileges. *Martin,* 192 Wis. 2d at 163, 165. So, just like Dr. Brusky, he needed the cooperation of other doctors to treat the patient at issue.

¶ 40. Even more significantly, one of the "alternate modes of treatment" noted by the supreme court in *Martin* was that the father of the patient there may have wished to go to *another* hospital, one with a neurosurgeon. *Id.* at 181. Obviously the defendant ER doctor would have had nothing to do with this course of action except *informing the father that it was an option.* This simply confirms what I have already said: the informed consent law is not about what the doctor should have *done,* but what he should have *told the patient.* Maybe Richard would never, under any circumstances, have been admitted to St. Agnes or had the ultrasound performed there. But as *Martin* makes clear, this fact does not mean that he did not have the right to know about his options, even if he had to go somewhere else to exercise them.

¶ 41. The majority finally observes that the Bubbs must show causation: that Richard's injuries (that is, his stroke forty-eight hours later) were in some part caused by Dr. Brusky's failure to inform him of the alternate treatment. Majority, ¶ 28. Of course, this would not be the case if Richard would have elected to leave the hospital and come in for follow-up, even had he been informed of the alternative. Few questions are more clearly factual, and thus for the jury, than questions about what a particular person *might have done* under different circumstances. The majority nevertheless musters a few facts to suggest what Richard might have done had he been informed that he had options. I will only observe that the fact that Richard wanted to go home when he did not know that he might be better off staying is extraordinarily weak evidence about what he would have done had he been so informed.