RE/MAX REALTY 100, Plaintiff-Appellant,

v.

Howard BASSO, Jr. and Basso Builders, Inc.,
Defendants-Respondents.

Court of Appeals

*No. 02–2650. Submitted on briefs May 21, 2003.—
Decided June 18, 2003.*

2003 WI App 146

(Also reported in 667 N.W.2d 857.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James L. McAlister* of *Deutch & Weiss*, Fox Point.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Terry P. Race*, Whitewater.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

¶ 1. SNYDER, J. Re/Max Realty 100 (Re/Max) appeals from a judgment in favor of Howard Basso, Jr. and Basso Builders, Inc. (Basso) in its breach of contract action. Re/Max claims that the trial court erred in denying its motion for a directed verdict at the close of its case-in-chief and argues that given the evidence, case law and language of the listing contract, it is entitled to its commission from Basso. We disagree and affirm the judgment.

# FACTS[1]

¶ 2. On December 14, 1999, Basso signed the first of three listing contracts for the sale of a new home in Burlington, Wisconsin. Re/Max was the real estate broker in each of the three listing agreements, with Mike Martin as the listing agent. The listing agreement gave Re/Max the exclusive right to sell the house during the agreement's term. Martin commenced efforts to sell the property but there was no serious interest in the home. Martin continued to work to sell the property and Basso repeatedly renewed the listing agreement.

¶ 3. The third listing contract is the focus of this appeal. The third listing contract was signed on May 3, 2000, and ended, by its own terms, on June 16, 2000. The listing price of the home was set at $199,900 and the commission was established at 6%, 5% if Martin was the selling agent. This listing contract stated, in relevant part:

> **EARNEST MONEY:** If Broker holds trust funds in connection with the transaction, they shall be retained by Broker in Broker's trust account. Broker may refuse to hold earnest money or other trust funds. Should

---

[1] WISCONSIN STAT. § 809.19(1)(d) (2001–02) requires the parties to provide in their briefs separate sections for their "statement of facts relevant to the issues presented for review" and argument. However, both parties have, inappropriately, interspersed some legal argument and "spin" into what should have been an objective recitation of the factual occurrences of this case. "[F]acts must be stated with absolute, uncompromising accuracy. They should never be overstated—or understated, or 'fudged'—in any manner." Judge William Eich, *Writing the Persuasive Brief*, WISCONSIN LAWYER MAGAZINE, Vol. 75, No. 2 (Feb. 2003). The fact section of a brief is not place for argument.

All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

Broker hold the earnest money, Seller authorizes Broker to disburse the earnest money pursuant to the terms of the offer to purchase, option or exchange agreement used in the transaction. If the transaction fails to close and the earnest money is disbursed to Seller, then upon disbursement to Seller the earnest money shall be paid first to reimburse Broker for cash advances made by Broker on behalf of Seller and one half of the balance, but not in excess of the agreed commission, shall be paid to Broker as Broker's full commission in connection with said purchase transaction and the balance shall belong to the Seller. This payment to Broker shall not terminate this Listing.

¶ 4. In May 2000, another Re/Max agent, Scott Surges, showed the property to Helen and Ronald Smolik. On May 17, 2000, the Smoliks wrote an offer to purchase the property; Basso countered. The Smoliks' offer to purchase specifically addressed how earnest money would be handled by Re/Max:

**EARNEST MONEY**

HELD BY: Unless otherwise agreed, earnest money shall be paid to and held in the trust account of the listing broker (buyer's agent if Property is not listed or Seller's account if no broker is involved), until applied to purchase price or otherwise disbursed as provided in the Offer. *CAUTION: Should persons other than a broker hold earnest money, an escrow agreement should be drafted by the Parties or an attorney. If someone other than Buyer makes payment of earnest money, consider a special disbursement agreement.*

In order to bring Basso and the Smoliks closer together on their offers, Martin and Basso agreed that Martin would reduce his commission. Martin then drafted Basso's second counteroffer. The Smoliks signed the

228

second counteroffer on Saturday, May 20, 2000. Helen Smolik also wrote a personal check in the amount of $25,000 in earnest money. The closing was scheduled for Friday, May 26, 2000.

¶ 5. A home inspection took place on Tuesday, May 23, 2000. At that time, having realized that the Smoliks' out-of-state check would not clear in time for the closing, Surges arranged for the Smoliks to provide him with a certified check for the earnest money and Surges then returned the Smoliks' personal check to them; however, the Smoliks never produced the certified check. Basso was never told that Surges returned the personal check to the Smoliks. The Smoliks failed to appear at the May 26, 2000 closing and the transaction did not take place. Basso asked Martin what Re/Max planned to do about the return of the earnest money; Martin informed Basso that, in essence, Re/Max did not intend to pursue the Smoliks for the money but whatever Basso "got out of it, it was all [his]," that Martin was not looking for a commission. After May 26, 2000, Basso legally pursued the Smoliks himself for the earnest money and eventually received the $25,000.

¶ 6. Re/Max then sued Basso, alleging that it was due a commission under the listing contract. Basso counterclaimed, alleging breach of contract and breach of fiduciary duty. A jury trial took place on August 13, 2002. At the close of Re/Max's case-in-chief, Re/Max moved for a directed verdict. This motion was denied. The jury found that Re/Max was not entitled to receive a commission pursuant to the terms of the listing contract; the jury also found that Re/Max did not breach the contract or its fiduciary duty to Basso. After verdict, Re/Max moved for judgment notwithstanding the verdict. This motion was denied. The trial court

then entered an order for judgment and judgment dismissing all claims and counterclaims. Re/Max appeals.

## DISCUSSION

¶ 7. Re/Max argues that the trial court erred in denying its motion for a directed verdict. The standard of review upon the denial of a motion for directed verdict is whether, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion was made, there is any credible evidence to sustain a finding in favor of that party. *Warren v. Am. Family Mut. Ins. Co.*, 122 Wis. 2d 381, 384, 361 N.W.2d 724 (Ct. App. 1984). If there is any credible evidence to sustain a cause of action, the case must be submitted to the jury. *Id.*

¶ 8. Here, Re/Max's complaint against Basso alleged a breach of the listing contract. In order to resolve this issue, we must interpret the contract language. *Kailin v. Armstrong*, 2002 WI App 70, ¶ 18, 252 Wis. 2d 676, 643 N.W.2d 132. The construction of a written contract is a question of law we review de novo. *Id.* If the terms of the contract are plain and unambiguous, it is our duty to construe the contract according to its plain meaning even though one of the parties may have construed it differently. *Id.*

¶ 9. We must be careful to accurately state Re/Max's position on the alleged breach of contract: Re/Max did not seek its commission under the listing contract because it found a ready, willing and

able buyer. Rather, Re/Max sought its commission under the provision of the listing contract that provides that it is entitled to the earnest money even if the buyer fails to complete the transaction. The provision of the listing contract relied upon by Re/Max does not support its position.

¶ 10. Both parties appear to agree, implicitly at least, that the Smoliks were ready, willing and able buyers and an enforceable contract existed. However, we agree with Basso that Re/Max appears to assume that its only duty was to obtain an enforceable contract with a buyer and fulfillment of that duty entitled it to a commission; however, the listing contract imposed additional duties upon Re/Max before it was entitled to a commission.

¶ 11. The relevant portion of the listing contract states:

> **EARNEST MONEY**: If Broker holds trust funds in connection with the transaction, they shall be retained by Broker in Broker's trust account. Broker may refuse to hold earnest money or other trust funds. Should Broker hold the earnest money, Seller authorizes Broker to disburse the earnest money pursuant to the terms of the offer to purchase, option or exchange agreement used in the transaction. *If the transaction fails to close and the earnest money is disbursed to Seller, then upon disbursement to Seller the earnest money shall be paid first to reimburse Broker for cash advances made by Broker on behalf of Seller and one half of the balance, but not in excess of the agreed commission, shall be paid to Broker as Broker's full commission in connection with said purchase transaction and the balance shall belong to the Seller.* This payment to Broker shall not terminate this Listing. (Emphasis added.)

Thus, under the explicit and unambiguous terms of the

231

listing contract upon which Re/Max relies, Re/Max is entitled to its commission only if the buyer fails to complete the transaction *and* the earnest money is distributed to the seller. Here, by Re/Max's own admission, the earnest money was never distributed to Basso. Thus, under the plain terms of the contract, because the earnest money was never distributed to Basso, Re/Max is not entitled to its commission.

¶ 12. In addition, Re/Max never complied with the terms of the Smoliks' offer to purchase, which indicates that earnest money must be paid to and held in the trust account of the listing broker until applied to the purchase price or otherwise disbursed. Here, by Martin's and Surges's own admissions, this earnest money was never deposited in Re/Max's trust account. In fact, Martin acknowledged that by returning the check to the Smoliks, Re/Max was, in essence, refusing to hold the earnest money, despite the offer to purchase's requirement that it do so. Re/Max did not meet its burden of proof for a directed verdict because in considering all credible evidence and reasonable inferences therefrom in a light most favorable to Basso, there is credible evidence to sustain a finding in Basso's favor. *See Warren*, 122 Wis. 2d at 384. Thus the case was properly submitted to the jury. *See id.*

■

¶ 13. Furthermore, we agree with the trial court that in returning the earnest money check to the Smoliks, Re/Max breached its contract with Basso. Re/Max returned the earnest money to the Smoliks without Basso's knowledge or consent. The listing contract did not permit it to do so. At trial, Martin acknowledged that any basis for a commission had to come from the listing contract and that nothing in the listing contract required earnest money in the form of a

certified check. Martin also acknowledged that no one ever told Basso that the personal check had been returned to the Smoliks. Martin conceded that the offer to purchase required Re/Max to hold the earnest money but Re/Max had refused to do so and he could not explain or reconcile this problem. In addition, Surges acknowledged it was a mistake to return the personal check to the Smoliks.

¶ 14. Furthermore, we strongly disagree with Re/Max's assertion that any alleged breach it may have committed was merely "a fly in the ointment." This was a serious breach of duty that a broker owes a client. This breach jeopardized Basso's right to the $25,000 earnest money, a substantial amount of money, and forced him to pursue other remedies on his own.

¶ 15. We also agree with Basso that Re/Max arguably violated its duties under Wis. Stat. § 452.133. Section 452.133 addresses the duties of brokers and states, in relevant part:

> **(2)** Duties to a client. In addition to his or her duties under sub. (1), a broker providing brokerage services to his or her client shall do all of the following:

> (a) Loyally represent the client's interests by placing the client's interests ahead of the interests of any other party, unless loyalty to a client violates the broker's duties under sub. (1) or s. 452.137(2).

> (b) Disclose to the client all information known by the broker that is material to the transaction and that is not known by the client or discoverable by the client through reasonably vigilant observation, except for confidential information under sub. (1)(d) and other information the disclosure of which is prohibited by law.

(c) Fulfill any obligation required by the agency agreement, and any order of the client that is within the scope of the agency agreement, that are not inconsistent with another duty that the broker has under this chapter or any other law.

**(3)** PROHIBITED CONDUCT. In providing brokerage services, a broker may not do any of the following:

(a) Accept any fee or compensation related to the transaction from any person other than the broker's client, unless the broker has the written consent of all parties to the transaction.

(b) Act in a transaction on the broker's own behalf, on behalf of the broker's immediate family, or on behalf of any organization or business entity in which the broker has an interest, unless the broker has the written consent of all parties to the transaction.

(c) Except as provided in s. 452.19, refer, recommend or suggest to a party to the transaction the services of an individual or entity from which the broker may receive compensation for a referral or in which the broker has an interest, unless the broker has disclosed the fact that he or she may receive compensation or has disclosed his or her interest in the individual or entity providing the services.

By returning the check to the Smoliks in the manner that it did, Re/Max arguably placed the needs and interests of its business ahead of Basso's needs, in violation of § 452.133(2)(a); failed to disclose to Basso the return of the check, information material to the transaction, in violation of § 452.133(2)(b); and failed to fulfill the terms of the offer to purchase, in violation of § 452.133(2)(c).

234

## CONCLUSION

¶ 16. Re/Max is not entitled to a commission under the terms of the listing contract as the earnest money was never disbursed to Basso. The trial court was correct in denying Re/Max's motion for a directed verdict. We therefore affirm the judgment.

*By the Court.*—Judgment affirmed.