Phyllis E. HAGENY, Individually and as
Personal Representative of the
Estate of Thomas A. Hageny, Deceased,
Plaintiff-Appellant,†

v.

Joseph A. BODENSTEINER, MD., Physicians
Insurance Company of Wisconsin, Inc. and
Wisconsin Injured Patients and Families
Compensation Fund,
Defendants-Respondents,

STATE of Wisconsin
HEALTH INSURANCE RISK SHARE PLAN,
Defendant.

Court of Appeals

*No. 2008AP133. Oral argument December 2, 2008.
—Decided December 23, 2008.*

2009 WI App 10

(Also reported in 762 N.W.2d 452.)

† Petition to review pending.

241

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Linda V. Meagher* and *D.*

243

*James Weis* of *Habush, Habush & Rottier, S.C.*, Waukesha. There was oral argument by *D. James Weis*.

On behalf of the defendants-respondents, Joseph A. Bodensteiner, M.D. and Physicians Insurance Company of Wisconsin, Inc., the cause was submitted on the brief of *Paul H. Grimstad* and *Jacqueline Lorenz Sehloff* of *Nash, Spindler, Grimstad & McCracken, LLP*, Manitowoc. There was oral argument by *Paul H. Grimstad*.

Before Hoover, P.J., Peterson and Brunner, JJ.

¶ 1. PETERSON, J. The Estate of Thomas Hageny, and his widow, Phyllis, (collectively, Mrs. Hageny) appeal a judgment dismissing their medical malpractice claims against Dr. Joseph Bodensteiner and related insurers. Mrs. Hageny argues the circuit court erred by deciding as a matter of law not to submit the issue of informed consent to the jury. We disagree and affirm.

## Background

¶ 2. Thomas Hageny died in a hospital recovery room following surgery by Dr. Bodensteiner to remove Hageny's gallbladder. Bodensteiner was aware of Hageny's medical history. Hageny had a long history of severe cardiovascular disease, including severe blood vessel and heart disease. He was taking medication to lower his blood pressure when he saw Bodensteiner.

¶ 3. Before surgery, Bodensteiner and Hageny discussed the risks and potential complications of surgery. Among other risks, they discussed the possibility of severe blood loss, cardiac arrest and death. Hageny signed an informed consent form acknowledging the risks and complications and authorizing Bodensteiner to address any condition that arose.

¶ 4. Almost immediately after surgery, Hageny's blood pressure began to drop. The recovery room nurse

administered several doses of Ephedrine; however, the Ephedrine failed to raise Hageny's blood pressure. When Bodensteiner examined Hageny, he determined Hageny's nonresponsiveness to the Ephedrine indicated either a heart problem or a bleed. Bodensteiner decided to push fluids and increase the Ephedrine doses in an attempt to raise Hageney's blood pressure. Half an hour later, Bodensteiner requested a cardiac work-up, because Hageny still was not improving. The internist was unable to complete the work-up because blood started coming out of Hageny's drain. Shortly thereafter, Hageny died. The autopsy revealed a clip on Hageny's artery had come off and he bled to death.

¶ 5.    Mrs. Hageny sued, alleging (1) negligent care and treatment and (2) failure to obtain informed consent. She did not dispute that her husband had validly consented to the procedure before surgery. Rather, she argued Bodensteiner should have conducted a second informed consent discussion when Hageny's blood pressure dropped. Mrs. Hageny contended that Bodensteiner's diagnosis of a cardiac event or an internal bleed presented three options:    (1) order an EKG to rule out a cardiac event; (2) perform an ultrasound to determine whether he was bleeding; or (3) try to raise his blood pressure with fluids and Ephedrine before ordering a cardiac work-up. She argued a second informed consent discussion was necessary to apprise Hageny of the existence of these options, as well as the risks and benefits of each.

¶ 6.    The trial court declined to instruct the jury on informed consent. It limited the instructions and verdict to the issue of negligent care and treatment. The court concluded Hageny's postoperative condition did not require a separate informed consent, but was inextricably entwined with Bodensteiner's ongoing duty

245

to provide postoperative care for the procedure Hageny had authorized him to perform.

> Clearly this is a situation where the physician operating under the original consent for surgery still had a patient in his care in a postoperative situation, he had responsibility for this patient, and determining the situation of the patient's health status is his unique and sole province as the surgeon in charge of this procedure.[1]

The jury found Bodensteiner was not negligent in his care and treatment of Hageny. Mrs. Hageny now appeals the trial court's failure to instruct on informed consent.

## Standard of Review

■

¶ 7.   This case ultimately turns on whether there was sufficient evidence to present the informed consent issue to the jury. When a circuit court "refuse[s] to instruct the jury on informed consent and refuse[s] to include an informed consent question on the special verdict, it effectively [grants a directed verdict] on the claim." *Bubb v. Brusky*, 2008 WI App 104, ¶ 17, 313 Wis. 2d 187, 756 N.W.2d 584. This presents a question of law that we review independently. *Id.* When review-

---

[1] The circuit court's other basis for declining to submit the informed consent question to the jury was that there was no risk involved in the three options for treatment Mrs. Hageny posited. The court reasoned that "when there is no risk benefit analysis to be performed . . . the issue is . . . solely whether the physician failed to exercise [the] reasonable care expected of him." This reasoning is not germane to our holding that that there was no substantial change in medical circumstances. Therefore, we need not address it.

ing a directed verdict, we consider all credible evidence, including reasonable inferences that can be drawn from the evidence, in the light most favorable to the party against whom the verdict is directed. *Re/Max Realty 100 v. Basso*, 2003 WI App 146, ¶ 7, 266 Wis. 2d 224, 667 N.W.2d 857. A directed verdict "on grounds of insufficiency of the evidence is appropriate where there is no credible evidence to support a finding in favor of the claim." *Bubb*, 2008 WI App 104, ¶ 15.

## Discussion

■■
¶ 8.   Wisconsin's informed consent law requires a physician to "inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments." WIS. STAT. § 448.30.[2] The purpose of the informed consent discussion is to provide the patient "the risks and benefits of available treatment options . . . a reasonable patient would need to know in order to make an informed decision" about their treatment. *Schreiber v. Physicians Ins. Co.*, 223 Wis. 2d 417, 427, 588 N.W.2d 26 (1999). A physician need not disclose "absolutely every fact or remote possibility that could theoretically accompany a procedure." *Id.* Rather, the disclosure must be guided by "what the reasonable person in the position of the patient would want to know." *Id.*

■
¶ 9.   Our supreme court has recognized that a patient's consent to treatment is not categorically immutable once it has been given. *Id.* at 429. Instead, a physician must initiate a new informed consent discus-

---

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

sion when there is "a substantial change in circumstances, be it medical or legal." *Id.* at 433.

¶ 10.   Mrs. Hageny argues her husband's postoperative complications constituted a substantial change in medical circumstances and that Bodensteiner was therefore obligated to conduct a second informed consent discussion.[3] She contends that, at the very least, whether there was a substantial change in circumstances is a question of fact that should be submitted to the jury.

¶ 11.   Whether there was a substantial change in medical circumstances depends on how such a change is defined. Mrs. Hageny proposes it be defined as the emergence of options, not previously discussed with the patient, that create choices, risks, and benefits a patient would want to know. Thus, she contends that whether there is a substantial change in medical circumstances depends on whether the patient would have wanted to be consulted at a particular juncture during the course of treatment. In this vein, she suggests that her husband's postoperative complications constituted a substantial change in circumstances, because Hageny would have wanted to know about the options available for Bodensteiner to diagnose the cause of the low blood pressure.

---

[3] WISCONSIN STAT. § 448.30(6) does not require a physician to obtain the patient's informed consent "where the patient is incapable of consenting." Mrs. Hageny argues, however, that if her husband was not competent to consent, Bodensteiner was obligated to obtain her informed consent. Because we conclude there was no substantial change in medical circumstances necessitating a second informed consent discussion, we do not reach this issue.

¶ 12. We conclude Mrs. Hageny's definition is untenable. In essence, she proposes a tautology: a physician must conduct a new informed consent discussion whenever there is a substantial change in medical circumstances, and a substantial change in medical circumstances occurs when a reasonable patient would think a second informed consent discussion was neces-' sary. Mrs. Hageny's circular test does not provide a workable way to determine when medical conditions have changed to such an extent that a physician and patient must revisit the informed consent issue. Rather, we conclude that a second informed consent discussion is not necessary unless the medical conditions change such that the patient faces risks not disclosed prior to the procedure.

¶ 13. The *Schreiber* court described substantial changes in medical circumstances as unforeseen risks or benefits that alter the agreed upon course of treatment.

> Either a substantial medical or substantial legal change of circumstances results in an alteration of the universe of options a patient has and alters the agreed upon course of navigation through that universe. Where the change is medical, the alteration is a new risk or benefit previously unforeseen.

*Schreiber*, 223 Wis. 2d at 432. The court also referred favorably to a decision by the Colorado Supreme Court that more specifically addressed the types of changed medical circumstances that may necessitate a new informed consent conference. *Id.* (citing *Gorab v. Zook*, 943 P.2d 423, 430 (Colo. 1997)). In *Gorab*, the court held that since the "risks the patient faced during the procedure were risks previously disclosed, the physician

249

was not under a duty to conduct another informed consent discussion." *Gorab*, 943 P.2d at 430. Therefore, whether there is a substantial change of medical circumstances depends not on whether a reasonable person would have wanted to know what options a doctor considered when addressing a particular risk, but whether that risk was disclosed prior to the procedure.

¶ 14. Here, the risks Hageny faced were addressed by the initial informed consent discussion. The informed consent form Hageny signed acknowledged Bodensteiner informed him of the risks of "severe blood loss, infection, serious injury, cardiac arrest, and death." It indicated Hageny was aware that "unanticipated conditions may be revealed that require an extension of the original procedure," and that he gave Bodensteiner authority to "remedy[] conditions . . . not known to Dr. Bodensteiner at the time the operation is commenced, but are necessary and desirable in his . . . professional judgment." Knowing this, Hageny "authorize[d] and directe[d] Bodensteiner . . . to perform the . . . procedure[] . . . [including] such other diagnostic and therapeutic procedures as are . . . necessary . . . in his . . . professional judgment."

■

¶ 15. Mrs. Hageny concedes she would not have an informed consent claim if her husband's internal bleeding had occurred during the surgery. She argues, however, that the authority her husband gave Bodensteiner to address complications was diminished when his complications arose after surgery in the recovery room. We discern no legitimate reason to make such a distinction. When a patient consents to surgery, acknowledges he or she understands complications may arise, and authorizes the doctor to remedy these complications, it follows that the patient has consented to

250

treatment of those complications whether they occur in the operating room or afterward in the recovery room.

¶ 16. The doctrine of informed consent is grounded in the doctor's duty to inform the patient of "significant potential risks . . . so that [the patient can] make a rational and informed decision of whether [to] . . . undergo the proposed procedures." *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 11, 227 N.W.2d 647 (1975) (citing *Trogun v. Fruchtman*, 58 Wis. 2d 569, 207 N.W.2d 297 (1973)). Therefore, a doctor must "make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient . . . to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." *Scaria*, 68 Wis. 2d at 13.

¶ 17. In other words, the doctrine recognizes the patient's right to make choices concerning his or her own treatment, but it also acknowledges that the patient depends on the doctor's expertise and judgment. When the patient authorizes the physician to perform a procedure, the patient places himself or herself into the hands of the physician's medical judgment. It follows, then, that when a patient is informed of the risks of a procedure and consents to that procedure, the patient also authorizes the physician to address complications arising from those risks during the course of the procedure. To conclude otherwise would call into question what exactly it was the patient consented to in the first place.

251

¶ 18.   Here, the essential facts are not disputed. The parties agree the initial informed consent was valid and covered the surgical procedure. They agree about the sequence of events that occurred after Hageny's surgery. They also agree that Bodensteiner informed Hageny that the risks of the surgery included a cardiac event or internal bleeding, and that these were the complications Bodensteiner addressed as possible causes of Hageny's postoperative low blood pressure. The only dispute is whether Hageny's postoperative complications at some point became a substantial change in medical circumstances, necessitating a second informed consent discussion. Because it is undisputed Hageny was informed of the risks he later faced, the trial court did not err by refusing to send the informed consent issue to the jury.

*By the Court.*—Judgment affirmed.