**2023 WI APP 51**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2021AP1694

Complete Title of Case:

**RENAE WETTERLING,**

**PLAINTIFF-APPELLANT,**

**V.**

**MARK SOUTHARD, MD, SACRED HEART HOSPITAL FOUNDATION, INC.,**
**C/O GREGG ALBERT AND PROASSURANCE WISCONSIN INSURANCE COMPANY,**

**DEFENDANTS,**

**PREFERRED PROFESSIONAL INSURANCE COMPANY AND SACRED HEART HOSPITAL OF THE HOSPITAL SISTERS OF THE THIRD ORDER OF ST. FRANCIS, WISCONSIN INJURED PATIENTS AND FAMILIES COMPENSATION FUND,**

**DEFENDANTS-RESPONDENTS,**

**WELLS FARGO & COMPANY, ALLIANCE COLLECTION AGENCIES, INC. AND UNITED HEALTHCARE SERVICES, INC.,**

**SUBROGATED DEFENDANTS.**

| | |
|---|---|
| Opinion Filed: | September 12, 2023 |
| Submitted on Briefs: | August 16, 2022 |
| Oral Argument: | August 15, 2023 |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Gill, JJ. |

Concurred:
Dissented:

---

Appellant
ATTORNEYS:        On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Dana J. Wachs*, *Beverly Wickstrom* and *Kimberly Sweatt* of *Gingras, Thomsen & Wachs*, Eau Claire. There was oral argument by Dana J. Wachs.

Respondent
ATTORNEYS:        On behalf of the defendants-respondents, Preferred Professional Insurance Company and Sacred Heart Hospital of the Hospital Sisters of the Third Order of St. Francis, the cause was submitted on the brief of *John F. Mayer* and *Justin F. Wallace* of *Mayer, Graff & Wallace LLP*, Manitowoc. There was oral argument by John F. Mayer.

On behalf of the defendant-respondent, Wisconsin Injured Patients and Families Compensation Fund, the cause was submitted on the brief of *Guy DuBeau* of *Axley Brynelson, LLP*, Madison. There was oral argument by Guy DuBeau.

COURT OF APPEALS
DECISION
DATED AND FILED

September 12, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP1694**

Cir. Ct. No.  **2018CV67**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**

---

RENAE WETTERLING,

    PLAINTIFF-APPELLANT,

  V.

MARK SOUTHARD, MD, SACRED HEART HOSPITAL FOUNDATION, INC., C/O GREGG ALBERT AND PROASSURANCE WISCONSIN INSURANCE COMPANY,

    DEFENDANTS,

PREFERRED PROFESSIONAL INSURANCE COMPANY AND SACRED HEART HOSPITAL OF THE HOSPITAL SISTERS OF THE THIRD ORDER OF ST. FRANCIS, WISCONSIN INJURED PATIENTS AND FAMILIES COMPENSATION FUND,

    DEFENDANTS-RESPONDENTS,

WELLS FARGO & COMPANY, ALLIANCE COLLECTION AGENCIES, INC. AND UNITED HEALTHCARE SERVICES, INC.,

    SUBROGATED DEFENDANTS.

---

APPEAL from a judgment of the circuit court for Rusk County: STEVEN P. ANDERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1 HRUZ, J. Renae Wetterling appeals from a summary judgment dismissing all of her claims against Sacred Heart Hospital of the Hospital Sisters of the Third Order of St. Francis and its insurer Preferred Professional Insurance Company.[1] Wetterling argues that the circuit court erred by granting summary judgment on her negligence claim because a Sacred Heart nurse had a duty of ordinary care and he breached that duty by: (1) administering analgesic medication to her before the treating physician had an informed consent discussion with her; and (2) failing to notify the physician that the medication had been administered before the informed consent discussion occurred. Wetterling suggests that she was incapable of providing informed consent after receiving the medication, and that she would not have consented to the procedure that ultimately led to her serious injuries if she had not been medicated before the doctor sought her consent.

¶2 Even if we assume that the nurse had a duty of ordinary care and that he breached that duty, we conclude that Sacred Heart cannot be held liable for Wetterling's claimed lack of informed consent. Neither WIS. STAT. § 448.30 (2021-22),[2] nor any other law of which we are aware creates a duty or liability on the part of individuals other than a patient's treating physician to ascertain whether a patient is capable of providing his or her informed consent. Only the physician performing

---

[1] Sacred Heart and Preferred are represented by the same counsel. For simplicity, we will refer to only Sacred Heart when discussing both Preferred and Sacred Heart's arguments.

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Wetterling's procedure had the obligation to determine whether Wetterling had the mental capacity to provide her informed consent for the procedure. Thus, any negligence that might have occurred before the informed consent discussion is too remote, in a legal sense, from Wetterling's injuries and is therefore barred by public policy, as reflected in § 448.30. Accordingly, we affirm the circuit court's grant of summary judgment.

## BACKGROUND

¶3    In the summer of 2016, Wetterling's primary care physician discovered a cavitary lesion on Wetterling's left lung. The physician subsequently referred Wetterling to Dr. Fadi Sabbagh for a pulmonary examination. Sabbagh confirmed that Wetterling had a small cavitary lesion and, given its location, recommended that Wetterling undergo a CT-guided biopsy to further evaluate it. Sabbagh informed Wetterling that the procedure "was very safe" but might result in some localized bleeding. After discussing the procedure with Sabbagh, Wetterling agreed to go forward with the biopsy, which was later scheduled to be performed by Dr. Mark Southard at Sacred Heart.

¶4    On the day of the biopsy, Wetterling arrived at Sacred Heart with her mother, Sharon Wetterling,[3] at approximately 8:00 a.m. Hospital staff subsequently directed Wetterling to a lab for her to provide a blood sample. Shortly thereafter, Nurse Michael LuCore, who was an employee of Sacred Heart, led Wetterling and Sharon to a room where Wetterling changed into a hospital gown. At approximately

---

[3] Because Sharon shares the same last name as Wetterling, we will refer to her by her first name throughout the duration of this opinion.

8:53 a.m., LuCore administered Valium and Hydrocodone to Wetterling in preparation for the biopsy.

¶5      At some point, Dr. Southard entered the room and had a conversation with Wetterling, Sharon, and LuCore—the timing and content of this conversation, however, are highly disputed.  According to Southard, he came into the room and had an informed consent conversation with Wetterling *before* "authorizing" her to receive Valium or any analgesic medication.  Sharon and LuCore agreed, however, that Southard did not come into the room until *after* Wetterling had received that medication.  LuCore did not specifically recall whether he told Southard that Wetterling had already received the medication, but he noted that he typically would do so.

¶6      Consistent with Dr. Southard's recollection, LuCore recalled that Southard discussed the procedure's risks with Wetterling sometime before 9:10 a.m.  LuCore also believed that Wetterling was "very alert" during her conversation with Southard.  Sharon, on the other hand, recalled that Wetterling "was a little dopey in her speech and her relaxation" within five to ten minutes of receiving the medication.  Sharon also stated that Southard never discussed the risks of the procedure with Wetterling.  Wetterling could not recall whether she received medication before speaking to Southard, nor could she recall whether Southard informed her of the procedure's risks, although she believed that he did not.

¶7      Eventually, Sharon signed an informed consent form, in lieu of Wetterling's signature.  Doctor Southard and LuCore also signed the form, and all of the signatures listed a time of 9:10 a.m.  LuCore later acknowledged that he had

asked Sharon to sign the informed consent form because Wetterling, who was not a minor, could have been under the influence of her medication.[4]

¶8    After Sharon signed the informed consent form, Wetterling was taken to the procedure room for the CT-guided biopsy.  During the procedure, Dr. Southard collected several tissue samples, sent those samples to the pathology department, and evaluated Wetterling for complications.  When Southard finished, Wetterling was taken back to a recovery room.  Thereafter, Wetterling reported chest pain, but she was later discharged and left the hospital.

¶9    Wetterling's condition worsened during her drive home.  Sharon subsequently called an ambulance, and Wetterling was transported to a local emergency room before being transferred back to Sacred Heart.  Once there, Dr. Richard Daniels performed a splenectomy during a general abdominal exploration surgery.  According to Sharon, Daniels reported that Wetterling had "punctures in her spleen."

¶10   Nearly two years after Wetterling's splenectomy, Wetterling commenced this medical malpractice action, asserting several causes of action including negligence claims against both Dr. Southard and Sacred Heart. Specifically, Wetterling alleged that Southard had negligently perforated her spleen while performing the CT-guided biopsy.  She also alleged that Sacred Heart was liable under the doctrine of respondeat superior for the negligence of Southard and Sacred Heart employees.  In a later amended complaint, Wetterling added a claim

---

[4] The parties do not dispute, for purposes of this appeal, that Sharon lacked the legal authority to provide informed consent on behalf of Wetterling.

against Southard and Sacred Heart for failing to obtain Wetterling's informed consent before the biopsy.

¶11     Sacred Heart later moved for summary judgment on all of Wetterling's claims against it.  Sacred Heart argued that the duty to obtain informed consent rests entirely on the treating physician and that hospitals and their employees cannot be held liable for any deficiencies in obtaining informed consent. It also argued that it could not be held liable under the doctrine of respondeat superior for Dr. Southard's negligence because he is not a Sacred Heart employee.

¶12     In response, Wetterling conceded that Dr. Southard is not Sacred Heart's employee.  Nonetheless, Wetterling argued that her informed consent claim against Sacred Heart could not be dismissed because LuCore had a duty under Sacred Heart's internal policies to ensure that Wetterling gave informed consent. Wetterling also argued that her respondeat superior claim against Sacred Heart could not be dismissed because there was a genuine issue of material fact about whether LuCore negligently failed to satisfy his responsibilities under Sacred Heart's policies.

¶13     Following Wetterling's response, the Wisconsin Injured Patients and Families Compensation Fund ("the Fund") filed a brief joining Sacred Heart's motion for summary judgment.  In addition to the arguments already made by Sacred Heart, the Fund argued that Sacred Heart's policies cannot "establish the standard of care duty in a medical negligence claim."

¶14     The circuit court held oral argument and later granted summary judgment in favor of Sacred Heart, dismissing all claims and causes of action against it.  In doing so, the court concluded that a hospital's policies regarding informed consent do not create a legal duty or allow patients to sue based on any standard of

care derived from those policies. The court further concluded that the duty of obtaining informed consent rests solely with the doctor and has not been extended, under Wisconsin law, to hospitals or hospital staff.

¶15 Wetterling now appeals. Additional facts will be provided as necessary below.

## DISCUSSION

¶16 We review the circuit court's grant of summary judgment de novo, applying the same methodology as the circuit court. *DSG Evergreen Fam. Ltd. P'ship v. Town of Perry*, 2020 WI 23, ¶15, 390 Wis. 2d 533, 939 N.W.2d 564. Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). In determining whether there are any genuine issues of material fact, "we draw all reasonable inferences from the evidence in the light most favorable to the non-moving party." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781. We can affirm a grant of summary judgment on different grounds from those relied on by the circuit court. *International Flavors & Fragrances, Inc. v. Valley Forge Ins. Co.*, 2007 WI App 187, ¶23, 304 Wis. 2d 732, 738 N.W.2d 159.

¶17 Well-established Wisconsin law provides that the treating physician—not the hospital—bears the duty of advising a patient of a treatment's risks and ensuring that the patient provides his or her informed consent. *Mathias v. St. Catherine's Hosp.*, 212 Wis. 2d 540, 548, 569 N.W.2d 330 (Ct. App. 1997). That duty is codified in WIS. STAT. § 448.30, which provides in pertinent part:

> Any physician who treats a patient shall inform the patient about the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments.… The physician's duty to inform the patient under this section does not require disclosure of:
>
> (2) Detailed technical information that in all probability a patient would not understand.
>
> (3) Risks apparent or known to the patient.
>
> (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.
>
> (5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.
>
> (6) Information in cases where the patient is incapable of consenting.
>
> (7) Information about alternate medical modes of treatment for any condition the physician has not included in his or her diagnosis at the time the physician informs the patient.

*Id.*; *see also* ***Mathias***, 212 Wis. 2d at 548. "The doctrine of informed consent is grounded in the doctor's duty to inform the patient of 'significant potential risks … so that [the patient can] make a rational and informed decision of whether [to] … undergo the proposed procedures.'" ***Hageny v. Bodensteiner***, 2009 WI App 10, ¶16, 316 Wis. 2d 240, 762 N.W.2d 452 (2008) (alterations in original; quoting ***Scaria v. St. Paul Fire & Marine Ins. Co.***, 68 Wis. 2d 1, 11, 227 N.W.2d 647 (1975)).

¶18 Wetterling does not dispute that LuCore, as a nurse, did not have a duty to obtain her informed consent prior to the CT-guided biopsy. Rather, she argues that LuCore had a duty of ordinary care and that he breached *that* duty by administering analgesic medication before Dr. Southard obtained her consent and by failing to inform Southard that those medications had been administered before the informed consent discussion occurred. According to Wetterling, LuCore created

a situation in which she "was incapable of giving informed consent for the biopsy." Thus, in this appeal, we must determine whether a hospital can be held liable for an employee's actions that affected a patient's mental capacity to provide informed consent for a medical procedure.[5]

¶19    The parties' briefing focuses largely on whether LuCore had a duty of care, whether Sacred Heart's internal policies could establish a duty or could evidence the relevant standard of care, and whether LuCore breached his alleged duty. Ultimately, we need not reach these issues because even if we assume that LuCore had a duty and that he breached the relevant standard of care, we conclude that Sacred Heart cannot be held liable under the circumstances of this case.

¶20    At oral argument, Sacred Heart and the Fund repeatedly emphasized that WIS. STAT. § 448.30 applies to only physicians. They further noted that a physician has both the obligation and the opportunity to determine whether the patient is capable of providing informed consent, regardless of what might have occurred before the informed consent discussion. The Fund and Sacred Heart likened the physician's assessment of a patient's capacity to a type of "superseding cause" or an event that would cut off any possible liability on the part of a nurse.

¶21    As Sacred Heart and the Fund stressed at oral argument, our legislature has not extended the scope of the informed consent duty—or the scope of liability—beyond the treating physician. *See* WIS. STAT. § 448.30. Section 448.30 speaks in terms of only a *physician's* duty to inform the patient; it does not address circumstances, such as here, where an individual's actions affect

---

[5] Although the facts are disputed as to whether the medication actually impaired Wetterling's mental capacity, we assume for purposes of summary judgment that the medication did affect Wetterling's capacity to provide informed consent.

9

the patient's mental capacity before the physician's informed consent discussion. Although our legislature has created informed consent statutes for other medical professionals, such as podiatrists, physician assistants and chiropractors, *see* WIS. STAT. §§ 448.697, 448.9785, 446.08, it—again—has not created a duty or possible liability for other individuals who interact with patients prior to their informed consent discussions.

¶22    The absence of an express duty or standard of care for an individual who interacts with a patient prior to the physician is consistent with a physician's obligations in WIS. STAT. § 448.30 and the nature of an informed consent discussion. Section 448.30 requires that a physician "*inform* the patient about the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments." *See id.* (emphasis added). "Inform" means "to communicate knowledge to [a person]" or to "make [a person] acquainted." *Inform*, WEBSTER'S THIRD NEW INT'L DICTIONARY (unabr. 1993). Thus, when considered in the context of § 448.30,[6] the word "inform" means more than a physician merely reciting the relevant information; rather, the physician must actually convey the information in a manner such that the patient can understand it and use it to make an informed decision.[7]

---

[6] "[T]he context of a statutory scheme is important to the plain meaning of the text." *Townsend v. ChartSwap, LLC*, 2021 WI 86, ¶16, 399 Wis. 2d 599, 967 N.W.2d 21.

[7] "For example, a physician can mouth words to an infant, or to a comatose person, or to a person who does not speak his or her language but, unless and until such patients are capable of understanding the physician's point, the physician cannot be said to have" informed the patient of anything. *See Macy v. Blatchford*, 8 P.3d 204, 210 (Or. 2000).

¶23 It therefore follows that a physician has an inherent responsibility under WIS. STAT. § 448.30 to assess whether the patient understands the provided information and whether the patient is capable of using that information to intelligently exercise his or her right to consent to a treatment.[8] This responsibility also comports with the general purpose of an informed consent discussion, which is to ensure that patients receive information that enables them "to intelligently exercise [their] right to consent or to refuse the treatment or procedure proposed."[9] *See Scaria*, 68 Wis. 2d at 13; *see also **Hageny***, 316 Wis. 2d 240, ¶8.

¶24 Importantly, a physician also has the opportunity to assess the patient's mental capacity to give informed consent. When a physician discusses the necessary information with a patient, the physician has a chance to converse with the patient, ask questions about how the patient is feeling, and observe the patient's overall demeanor. Regardless of what might have occurred before this conversation, the physician can—and must—determine for him- or herself whether the patient understands the physician's communications and whether the patient is capable of providing informed consent for a treatment. Notably, as the Fund discussed at oral argument, physicians are routinely confronted with patients who might be impaired by alcohol, pain, illicit or prescribed drugs, or some other

---

[8] WISCONSIN STAT. § 448.30 excuses a physician from providing "[d]etailed technical information that in all probability *a patient would not understand*" and "[i]nformation in cases where *the patient is incapable of consenting*." Sec. 448.30(2), (6) (emphasis added). Although these provisions do not expressly require a physician to evaluate a patient's understanding or ability to consent, they are nonetheless consistent with that principle. Here, there is no issue with the fact that, prior to the administration of medication, as a general matter, Wetterling would be capable of providing informed consent.

[9] In 2013, the legislature amended the standard under which a physician's disclosures are judged from the "prudent patient standard," *see **Brown v. Dibbell***, 227 Wis. 2d 28, 43, 595 N.W.2d 358 (1999), to "[t]he reasonable physician standard." *See* 2013 Wis. Act 111; *see also* WIS. STAT. § 448.30. However, that amendment does not appear to have changed the ultimate purpose of § 448.30.

11

impediment. Therefore, even if LuCore did not inform Dr. Southard that Wetterling had received analgesic medication, such an omission did not prevent or inhibit Southard's ability to determine whether Wetterling had the mental capacity to provide her informed consent.

¶25    Wetterling argues that LuCore's action of administering analgesic medication before the informed consent discussion is analogous to a motor vehicle passenger abruptly grabbing the steering wheel and causing a crash. We disagree. This is not a circumstance in which LuCore "prevented" Dr. Southard from obtaining Wetterling's informed consent. As the undisputed facts show, LuCore administered the analgesic medication roughly seventeen minutes before the informed consent form was signed. And, as discussed, Southard had both the obligation and opportunity to assess whether Wetterling had the mental capacity to provide informed consent. Furthermore, this is not a situation in which Southard could not have corrected any mistake that LuCore might have made. Southard had the opportunity to ask LuCore or Wetterling whether Wetterling had taken any medication. He also had the opportunity to independently evaluate Wetterling for any signs of impairment. For those reasons, this case is not analogous to a situation in which a motor vehicle driver is unable to correct a passenger's abrupt yank on the steering wheel.

¶26    Likewise, Wetterling's reliance on *Peeples v. Sargent*, 77 Wis. 2d 612, 253 N.W.2d 459 (1977), is misplaced. In *Peeples*, our supreme court concluded that there was sufficient evidence at trial for the jury to find several nurses and a hospital negligent for a patient's injuries. *Id.* at 629-30. Unlike the circumstances in this case, however, the alleged negligence did not involve the informed consent process. *See id.* Furthermore, and importantly, the treating doctor was not exclusively responsible under a particular statute for the care at issue, nor

does it appear that the doctor had the same clear obligation and opportunity—as Dr. Southard had in this case—to address any preceding negligence that might have occurred on the part of the nurses. *See id.* at 628-30.

¶27 Although Sacred Heart and the Fund referred to Dr. Southard's obligation and opportunity to assess Wetterling's mental capacity as a type of "superseding cause," the intervening or superseding cause doctrine has been supplanted in Wisconsin by a public policy ground that precludes liability where "the injury is too remote from the negligence."[10] *Cefalu v. Continental W. Ins. Co.*, 2005 WI App 187, ¶¶20-21, 285 Wis. 2d 766, 703 N.W.2d 743 (citation omitted); *see also Fandrey v. American Fam. Mut. Ins. Co.*, 2004 WI 62, ¶15 n.12, 272 Wis. 2d 46, 680 N.W.2d 345. This sole public policy ground provides a sufficient basis to deny liability in this case. *See Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶49, 313 Wis. 2d 294, 752 N.W.2d 862. It also, along with the other public policy grounds, reflects the principle that "we trace the consequences of one's negligent acts, not indefinitely, but to a certain point." *Cefalu*, 285 Wis. 2d 766, ¶24 (citation omitted).

¶28 Whether a public policy consideration precludes liability is a question of law that we review de novo. *Smaxwell v. Bayard*, 2004 WI 101, ¶40, 274 Wis. 2d 278, 682 N.W.2d 923. Generally, we will refrain from considering whether public policy grounds preclude liability until after a trial on the negligence claim, but we may consider the public policy issue "where the facts presented are simple to

---

[10] Courts may also deny liability on public policy grounds where: (1) "the recovery is 'wholly out of proportion to the culpability of the negligent tort-feasor'"; (2) "the harm caused is highly extraordinary given the negligent act"; (3) "recovery 'would place too unreasonable a burden' on the negligent tort-feasor"; (4) "recovery would be 'too likely to open the way to fraudulent claims'"; or (5) "recovery would enter into 'a field that has no sensible or just stopping point.'" *Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶49, 313 Wis. 2d 294, 752 N.W.2d 862 (citation omitted).

ascertain and the public policy questions have been fully presented." ***Hornback***, 313 Wis. 2d 294, ¶51.

¶29 Here, the facts—viewed in the light most favorable to Wetterling—are simple, and the public policy questions have been fully developed through briefing and oral argument. When considering that WIS. STAT. § 448.30 makes the treating physician exclusively responsible for obtaining a patient's informed consent, that the legislature has not expressly created a duty for—or extended liability to—other individuals interacting with the patient before the informed consent discussion, and that a physician has the obligation and, as here, the opportunity to assess the patient's mental capacity before the patient provides his or her informed consent, we agree that any negligent actions on the part of LuCore before the informed consent discussion are "too remote" from Wetterling's ultimate injuries. *See **Hornback***, 313 Wis. 2d 294, ¶49 (citation omitted). The remoteness is largely in a legal sense, tied to the statutory policy reflected in § 448.30, rather than in a strict temporal sense. Doctor Southard had an obligation and opportunity to assess Wetterling's ability to provide informed consent for the procedure. Furthermore, Wetterling does not contend that LuCore's administration of the analgesic medication was somehow negligent on its own or caused her injury beyond the potential impact on her ability to provide informed consent.

¶30 Accordingly, we conclude—under the specific facts of this case—that Sacred Heart cannot be held liable under the doctrine of respondeat superior for any negligent actions that LuCore might have committed prior to Dr. Southard's

informed consent discussion with Wetterling.[11]  Thus, the circuit court properly granted summary judgment and dismissed Wetterling's claims against Sacred Heart.

        *By the Court.*—Judgment affirmed.

---

[11] Of course, the facts are disputed as to whether Dr. Southard actually informed Wetterling about "the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments." *See* WIS. STAT. § 448.30.  This factual dispute, however, does not prevent us from concluding that Sacred Heart cannot be held liable for LuCore's allegedly negligent actions.